# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

DEANNA SMITH,
Plaintiff,

vs.

AMERICAN MODERN
INSURANCE GROUP, et al.,
Defendants.

Case No. 1:16-cv-844
Dlott, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

## I. Introduction

Plaintiff Deanna Smith brings this action against her former employer, American Modern Insurance Group ("American Modern") and Midland-Guardian Co. ("Midland"),[1] alleging claims of: (1) discriminatory discharge in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") and the Ohio Civil Rights Act, Ohio Rev. Code § 4112.02, *et seq.* (together "Count I"), (2) retaliatory discharge for taking leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* ("Count II"), and (3) discrimination on the basis of gender in violation of the Ohio Civil Rights Act, Ohio Rev. Code § 4112.02, *et seq.* ("Count IV").[2] This matter is before the Court on defendants' motion for summary judgment (Doc. 37), plaintiff's response in opposition (Doc. 45), and defendants' reply memorandum (Doc. 48).

## II. Facts

The following facts are undisputed unless otherwise noted.

Plaintiff began her employment with defendant American Modern on November 6, 1995 as an Adjuster Trainee. (Deposition of Deanna Smith, ("Pltf. Depo.") Vol. I, Doc. 30 at 154).

---

[1] Defendant American Modern is an Ohio corporation wholly owned by Defendant Midland-Guardian Co., also an Ohio corporation. (Complaint, Doc. 1 at ¶ 2).

[2] Plaintiff voluntarily dismissed Count III, her age discrimination claim. (Doc. 47).

Plaintiff received regular raises over the years. (*Id.* at 161). From January 2008 until the time of her termination in January 2015, plaintiff held the position of Litigation Specialist II. (*Id.* at 151). As a Litigation Specialist II, plaintiff was responsible for (1) coordinating the defense of lawsuits filed against defendants' policy holders, (2) responding to policy holders who informed defendants that lawsuits had been filed against them, (3) timely assigning outside counsel to defend lawsuits against policy holders that did not settle promptly, (4) serving as a liaison between policy holders and defense counsel to facilitate the litigation process, (5) promptly issuing settlement payments on behalf of policy holders when a settlement was reached, and (6) attempting to resolve claims before lawsuits were filed. (*Id.* at 158, 160).

From 2006 to 2012, in her duties as a Litigation Specialist and later as a Litigation Specialist II, plaintiff reported to Litigation Supervisor Kurt Groesch. (*Id.* at 157-58). From 2010 to 2012, plaintiff also reported to Litigation Supervisor Jody Blankenship. (*Id.* at 152; Deposition of Jody Blankenship, Doc. 33 at 132-33). In 2012, plaintiff began reporting directly to Ms. Blankenship. (Blankenship Depo. at 17). Ms. Blankenship then reported to Mr. Groetsch, who had been promoted to Casualty Manager. (*Id.* at 18). Mr. Groetsch, in turn, reported to Eric Hunziker, Director of the Casualty Division. (Deposition of Kurt Groetsch, Doc. 34 at 8-10; Deposition of Eric Hunziker, Doc. 35 at 7).

### A. Plaintiff's Early Requests for Medical Leaves of Absence

During the course of her employment, plaintiff took several medical leaves of absence, all of which were approved. Following two surgeries, plaintiff returned to work without incident and resumed the same job without a reduction in role, pay, or benefits. (Pltf. Depo. Vol. I at 87-91). She was given as much time as she needed to recover, and management allowed her to work from home as an accommodation. (*Id.* at 90-91).

In 2006, plaintiff had another surgery and took an additional medical leave of absence. (*Id.*). Management allowed plaintiff to take as much time off as needed and when she returned to work, she resumed the same job, without a reduction in role, pay, or benefits. (*Id.* at 93-94). Defendants never denied any of plaintiff's leave requests or requested accommodations, or discouraged plaintiff from reporting her medical conditions. (*Id.* at 94, 210; Pltf. Depo. Vol. II, Doc. 31 at 30).

### B. Plaintiff's Job Performance in 2008-2011

On January 21, 2008, Mr. Groetsch placed plaintiff on a 60-day Performance Plan to address performance issues identified in her 2007 performance review, which included issues such as lack of attention to detail, poor decision quality, inadequate planning, and failure to meet unit goals and measures. (Doc. 37-5). Mr. Groetsch stated in the Performance Plan: "[i]f your performance does not meet these requirements and show sustained improvement, further disciplinary action may be taken, up to and including a development plan, probation and/or possible termination of your employment." (*Id.* at 3). On June 15, 2010, Mr. Groetsch placed plaintiff on a second 60-day Performance Plan to address performance issues identified in her 2009 performance review. (Doc. 37-6). The Performance Plan outlined areas needing attention, including sustained improvement and consistency, attention to detail, decision quality, planning, and time management. (*Id.*). Mr. Groetsch warned plaintiff that "[s]hould [her] performance not meet these requirements, demonstrate consistent and sustained improvement, further disciplinary action will be taken in the form of probation." (*Id.* at 3).

On April 4, 2011, Mr. Groetsch placed plaintiff on formal probation as a result of her deficiencies in "the areas of planning, reporting, decision making, and meeting file quality

standards." (Doc. 37-7 at 2). In an accompanying memorandum, Mr. Groetsch made the following observations about plaintiff's performance:

> You have not demonstrated consistency in meeting deadlines. . . . The reservation of rights letter was issued almost 60 days after you were directed to issue the letter in the initial assignment.
>
> With respect to decision quality, there were delays in making decisions, as demonstrated with several coverage opinions, most notably the handling of the [name redacted] case.
>
> Productivity is negatively impacted by lack of focus, poor organization and prioritization. . . . Your lack of productivity was demonstrated in the [name redacted] claim, in which a report from counsel was received but not reviewed or reported by you for over 60 days.
>
> You are not meeting our established reporting guidelines. An example is securing pre-trial reports 60 days prior to trial. This has not been done consistently, which can negatively impact defense strategies, expense management, risk management and indemnity paid.

(*Id.* at 2-3).

Mr. Groetsch warned plaintiff: "[i]f the necessary improvements are not made, further disciplinary action, up to and including termination of your employment at any time during or following this plan will result." (*Id.* at 4). On September 26, 2011, plaintiff's probation period ended. (Pltf. Depo. Vol. I at 183; Pltf. Depo. Vol. III, Doc. 32 at 72; Docs. 37-8, 37-9). Mr. Groetsch noted that even though plaintiff's probation period had ended, "If your performance declines or if you have any performance issues in any area of your position, further disciplinary action, up to and including immediate termination will result." (Doc. 37-8). During plaintiff's probation period, defendants granted her request for FMLA leave from April 20, 2011 to June 5, 2011. (Docs. 37-10, 37-11, 37-12). Plaintiff testified that she was satisfied with the way these FMLA requests were handled. (Pltf. Depo. Vol. II at 56).

### C. Ms. Blankenship becomes Plaintiff's Direct Supervisor

In approximately 2012, Ms. Blankenship became plaintiff's direct supervisor after Mr.

Groesch was promoted to Casualty Manager. (Pltf. Depo. Vol. I at 150; Groetsch Depo. at 8-10).

Plaintiff testified that Ms. Blankenship was helpful, supportive, and "instrumental in [her] not

being fired" in 2010 and 2011 in connection with her placement on a Performance Plan and

probation. (Pltf. Depo. Vol. I at 183; Pltf. Depo. Vol. III at 44). Plaintiff considered Ms.

Blankenship to not only be her supervisor, but also a personal "friend." (Pltf. Depo. Vol. I at

249).

Plaintiff received positive performance evaluations from Ms. Blankenship in 2012 and

2013. (Doc. 44-1 at 4-16). In 2012, plaintiff received an overall score of 3.7. (*Id.* at 16). In

2013, plaintiff received an overall score of 3.4. (*Id.* at 4). Management conveyed to Litigation

Specialists that a "3" score is equivalent to an "A" grade and a "4" score is equivalent to an "A+"

grade. (Deposition of David Gifford, Doc. 40 at 21-23; Deposition of Scott Wedemeyer, Doc. 41

at 18-19). In 2013, Ms. Blankenship stated that plaintiff had a "very good" year and made

several positive comments about plaintiff's performance, including her coverage analysis, file

quality, ability to resolve claims, and sound decision-making. (Doc. 44-1 at 4-11; Blankenship

Depo. at 79-81, 85-87).

### D. Plaintiff's Job Performance in 2014

In 2014, Ms. Blankenship held one-on-one monthly meetings with the Litigation

Specialists she supervised, including plaintiff. During these monthly meetings, Ms. Blankenship

would provide feedback and constructive criticism to the litigation specialists she supervised.

(Blankenship Depo. at 60). As part of these monthly meetings, Blankenship would generally

provide a "Lit Scorecard" to the litigation specialists. (*Id.* at 99-101). The "Lit Scorecard" listed

certain metrics that the company tracked for each litigation specialist and reflected whether goals were met. (Doc. 44-2; Deposition of David Gifford, Doc. 40 at 33-36; Pltf. Declaration, Doc. 45-2 at ¶ 4). The scorecard measured the litigation specialist's production rate (i.e., the ratio of claim files closed) and the proper handling of claim files as audited by American Modern. (Gifford Depo. at 33-35; Pltf. Declaration at ¶ 4). Mr. Gifford, a Litigation Specialist II with American Modern, testified that the scorecard is a reflection of job performance. (Gifford Depo. at 35). Ms. Blankenship, however, testified that the score cards were neither "significant" nor "key performance indicators" to the performance evaluations of litigation specialists. (Blankenship Depo. at 101). Plaintiff's 2014 "Lit Scorecard" indicated that her overall production rate exceeded the company's goals. (*Id.* at 102).

In September 2014, plaintiff had a one-on-one meeting with Ms. Blankenship to discuss her performance for the third quarter of 2014. (Blankenship Depo. at 165). Ms. Blankenship testified that her third quarter meeting notes contained both positive and negative comments and that she reviewed these comments with plaintiff at the meeting. (*Id.* at 165-66). With respect to the critical comments under the "File Productivity and Time Management Section," she testified that "some of the negative comments are issues that would pose a risk that would concern me a great deal, particularly with Ms. Smith because they were the same issues [plaintiff] had struggled with in the past." (*Id.* at 166-67). Ms. Blankenship's third quarter notes cited approximately six examples of plaintiff's poor file productivity and time management. (Doc. 44-3 at 4). Plaintiff denies defendants' version of the September 2014 meeting and does not recall Ms. Blankenship communicating any specific performance deficiencies to her. (Doc. 45-1 at 3) (citing Pltf. Declaration at ¶ 5). On September 29, 2014, Ms. Blankenship emailed Mr. Groetsch and Mr. Hunziker and attached a performance document highlighting specific issues with

plaintiff's performance to discuss at a meeting the next day. (Groestch Depo. at 31-32; Doc. 37-14). The document contained a list of ten specific examples of plaintiff's performance issues in the areas of file productivity and time management. (Doc. 37-14 at 2). According to Ms. Blankenship, she met with Mr. Groestch and Mr. Hunziker in September 2014 and recommended plaintiff's termination based on her performance issues. (Blankenship Depo. at 44). Ms. Blankenship testified that plaintiff's performance "had deteriorated to a level that was alarming" and "very concerning," which she believed posed a risk to the company. (Id.). Ms. Blankenship testified that Mr. Groetsch and Mr. Hunziker accepted her recommendation. (Id. at 44-45). However, Mr. Groetsch testified that he had not received a recommendation from Ms. Blankenship to terminate plaintiff. (Groetsch Depo. at 31).

Ms. Blankenship then met with Cindy Gillings, Senior Human Resources Partner, in late September or early October to discuss plaintiff's performance issues. (Blankenship Depo. at 43-46, Deposition of Cindy Gillings, Doc. 36 at 30). According to Ms. Blankenship, she and Mr. Hunziker collectively recommended to Ms. Gillings during the meeting that plaintiff be terminated. (Blankenship Depo. at 46). Ms. Gillings recalled discussing plaintiff's performance issues with Ms. Blankenship only and did not recall whether Ms. Blankenship recommended that plaintiff be terminated at that meeting. (Gillings Depo. at 20-22). Ms. Gillings recommended that Ms. Blankenship caution plaintiff that she must improve her performance to management's satisfaction or risk termination. (Blankenship Depo. at 47; Gillings Depo. at 21).

Ms. Blankenship met with plaintiff in early October to discuss her performance. The parties dispute the details of the meeting. According to defendants, Ms. Blankenship reviewed a list of performance deficiencies and cautioned plaintiff that she needed to "take [the list] seriously" and "correct [the deficiencies] by the end of the year." (Blankenship Depo. at 47-49).

Plaintiff recalls primarily positive feedback from her one-on-one meetings with Ms. Blankenship, especially during the October 2014 meeting. (Pltf. Depo. Vol. II at 77). Plaintiff states that she was never warned that her job performance was deteriorating, her performance needed to improve immediately, or that her job was in jeopardy. (Pltf. Declaration at ¶ 5).

### E. Plaintiff Requests FMLA Leave in December 2014

On December 2, 2014, plaintiff informed Ms. Blankenship that she would be out of the office for an indeterminate amount of time due to "health problems," including numbness in her hands, feet, and lower legs. (Pltf. Depo. Vol. II at 57; Blankenship Depo. at 168-70). Plaintiff's last day in the office was December 1, 2014. (Pltf. Depo. Vol. II at 57). Management then approved plaintiff for FMLA leave from December 2, 2014 through January 30, 2015. (Pltf. Depo. Vol. II at 56-61; Doc. 37-15 at 1). The Human Resources Department assisted plaintiff with questions concerning her FMLA leave and she encountered no difficulties getting her FMLA leave approved. (Pltf. Depo. Vol. II at 57-58). During the leave, plaintiff also requested "a standing workstation to help with . . . circulation for [her] feet." (Pltf. Depo. Vol. I at 209-10). Plaintiff's managers granted her requested accommodation. (Pltf. Depo. Vol. II at 69-72; Hunziker Depo at 17; Groetsch Depo at 56-57). On December 8, 2014, Ms. Blankenship reported to Mr. Groetsch and Mr. Hunziker that plaintiff would be absent for at least 30 days because her doctor believed she had nerve damage from diabetes. (Doc. 44-3 at 14). On January 5, 2015, Ms. Blankenship reported to Mr. Groestch, Mr. Hunziker, and Ms. Gillings that plaintiff was scheduled to undergo an MRI to determine if the numbness was related to her diabetes, and Ms. Blankenship also reported that plaintiff had been diagnosed with carpal tunnel in her right arm. (Blankenship Depo. at 186-87; Doc. 44-4 at 3). On January 23, 2015, Ms. Blankenship reported to Mr. Groetsch and Mr. Hunziker that plaintiff would be returning to work on February

2, 2015. (Blankenship Depo. at 193; Doc. 44-4 at 6). A few days later, Ms. Blankenship reported to them that plaintiff would miss an additional day of work on February 6, 2015 to have a "procedure on her right hand" for carpal tunnel syndrome. (Blankenship Depo. at 196-97; Doc. 44-4 at 10). Ms. Blankenship testified, however, that she was not aware that plaintiff had a number of health problems prior to plaintiff's termination. (Blankenship Depo. at 119-20).

### F. Ms. Blankenship Obtains Access to Plaintiff's E-mail

While plaintiff was on leave, on December 8, 2014, Ms. Blankenship asked Ms. Gillings for access to plaintiff's email account. Ms. Blankenship testified that she did not want to leave plaintiff's files unattended indeterminately while she was on leave. (Blankenship Depo. at 171-72, 180; Doc. 37-16 at 5). This was the first time that Ms. Blankenship requested access to a Litigation Specialist's email account. (Blankenship Depo. at 172). While having access to plaintiff's email, Ms. Blankenship perceived that plaintiff's performance had deteriorated more than previously understood. (*Id.* at 203; Doc. 37-17 at 2).

On December 12, 2014, Ms. Blankenship emailed Mr. Groetsch and Mr. Hunziker asking them to review an attached five-page memorandum before a meeting scheduled for December 15, 2014. (Doc. 37-17). Ms. Blankenship's memorandum sets forth 20 purported examples of plaintiff's performance deficiencies, including alleged mistakes on insurance claims that she found when handling plaintiff's files in her absence. (Doc. 37-1 at 13) (citing Blankenship Depo. at 198; Groetsch Depo. at 50-51; Hunziker Depo. at 20; Doc. 37-17). Plaintiff disputes the contents of the memorandum, specifically with regard to the alleged mistakes Ms. Blankenship claimed she made in Claim Nos. 068235AA, 2612718, 068195AA, 2614807, 068432AA, 068389AA, 2508451, and 2253688/068192AA. (Doc. 45-1 at 11-18). Ms.

Blankenship updated the contents of her memorandum on December 29, 2014. (Doc. 37-18). Plaintiff challenges the contents of the updated memorandum. (*See* Doc. 45-1 at 11-18).

### G. Plaintiff's Termination

On December 15, 2014, Ms. Blankenship, Mr. Hunziker, and Mr. Groetsch held a meeting to discuss plaintiff's performance. (Blankenship Depo. at 198; Groetsch Depo. at 51). Ms. Blankenship recommended that plaintiff be terminated. (Blankenship Depo. at 198-99; Hunziker Depo. at 19; Groetsch Depo. at 51). Both Mr. Groetsch and Mr. Hunziker agreed with Ms. Blankenship's recommendation. (Groetsch Depo. at 52; Hunziker Depo. at 9-10, 25-26). Ms. Blankenship, Mr. Groetsch, and Mr. Hunziker consulted Ms. Gillings, who concurred with the recommendation to terminate plaintiff. (Blankenship Depo. at 189; Gillings Depo. at 17). Ms. Gillings "indicated that she needed to talk to her superiors about the situation" before management could proceed with the termination. (Blankenship Depo. at 189; Gillings Depo. at 8).

As part of the final approval process, Ms. Gillings requested documentation of the reasons supporting plaintiff's termination to share with "legal counsel to determine next steps." (Gillings Depo. at 8). Ms. Gillings asked that Ms. Blankenship "put all of this in writing, to send this to [her] so that [they] would have all of the information to share with legal counsel." (*Id.* at 31). On January 28, 2015, Ms. Blankenship sent an email to Ms. Gillings, Mr. Groetsch, and Mr. Hunziker detailing issues with plaintiff's performance. (*Id.* at 27; Doc. 37-19). The email states that "during 2014, [plaintiff's] performance has declined to an unacceptable level. Many of the issues revolve around the same deficiencies that were exhibited in 2011, specifically, time management, reporting and quality claim files. . . ." (Doc. 37-19 at 4). Ms. Blankenship states:

> During her time out of the office (12/2/15 – 2/2/15), I had access to her email/inbox in order to respond to inquiries on her pending files.

The following performance issues were discovered.

The performance issues are the same as they were in 2011, with the added issue of not demonstrating support for the Munich Re US mission, vision and values – particularly not acting with integrity, not being accountable and no commitment to superior performance.

(*Id.*).

Ms. Blankenship summarized plaintiff's performance as follows:

[I]t is evident that she is not performing her job at an acceptable level. . . . There is a pattern of deterioration in her performance, and there is no acceptable reason for the deterioration. . . . Simply put, this is not a situation of "can't" perform, but "won't" perform. If [plaintiff] is placed on another probation plan, she will successfully come off of the plan because she can do the job. However, I have no confidence that 1 year or 18 months from now – we will not be right back where we are.

(*Id.* at 8).

On January 29, 2015, Ms. Gillings, Ms. Blankenship, Mr. Groetsch, and Mr. Hunziker

had a conference call with Donald S. Barth, Assistant General Counsel, to discuss plaintiff's

termination. (Gillings Depo. at 9; Blankenship Depo. at 194; Groetsch Depo. at 22; Hunziker

Depo. at 11-12). On January 30, 2015, Ms. Blankenship, Mr. Groetsch, and Sarah Farmer from

Human Resources called and informed plaintiff of her termination. (Pltf. Depo. Vol. II at 65-66;

Blankenship Depo. at 135-36; Groestch Depo. at 17). Plaintiff testified that Ms. Blankenship

informed her that she was fired for performance deficiencies that "had come to [Ms.

Blankenship's] attention during the time that [plaintiff] was out." (Pltf. Depo. Vol. II at 66).

Ms. Blankenship testified that it is fair to get an employee's input when an employee is placed on

a performance plan or probation. (Blankenship Depo. at 140). She also testified that it is fair to

get an employee's side of the story when criticizing an employee for a particular job

performance issue. (*Id.* at 141). Ms. Blankenship did not ask plaintiff for her side of the story

because the performance issues were "black and white." (*Id.*).

### III. Summary Judgment Standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Under Federal Rule of Civil Procedure 56(c), a grant of summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002). The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Satterfield*, 295 F.3d at 615; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Little Caesar Enters., Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 323). The burden then shifts to the non-moving party to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (emphasis in original). To meet that

burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. If, after an appropriate time for discovery, the opposing party is unable to demonstrate a prima facie case, summary judgment is warranted. *Street*, 886 F.2d at 1478 (citing *Celotex* and *Anderson*). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

## IV. Resolution

### A. FMLA Retaliation

Defendants argue that plaintiff cannot establish a prima facie case of FMLA retaliation because she cannot prove that there is a causal connection between her FMLA leave and her termination. (Doc. 37 at 13). Defendants assert that over the course of plaintiff's approximately twenty years of employment, she took several leaves for a variety of medical reasons, all of which were granted without incident and allowed her to return to work without incident. (*Id.* at 13-14). Moreover, defendants assert that plaintiff received raises and a promotion as she took multiple medical leaves over the years and was granted permission to take leave during her 60-day probation period in 2011. (*Id.* at 14). Defendants assert that the sole evidence underlying plaintiff's FMLA retaliation theory is a temporal connection between her termination and her leave. (*Id.*). Defendants also contend that they have met their "extremely light" burden of articulating a legitimate, non-discriminatory reason for plaintiff's termination. (*Id.* at 15) (citing *Baseball at Trotwood, LLC v. Dayton Professional Baseball Club, LLC*, 204 F. App'x 528, 536 (6th Cir. 2006)). Defendants explain that "plaintiff exhibited a long-standing and persistent failure to meet her employer's reasonable performance expectations." (*Id.*). Finally, defendants maintain that plaintiff cannot show that their legitimate, non-retaliatory reason for her

termination—failure to meet employer's expectations—is pretextual. (*Id.* at 15-21). Defendants allege that they held an honest belief in terminating plaintiff for a long history of performance issues, which includes her placement on two performance review plans, a formal probation, summonses to numerous meetings to address her performance issues, and managerial documentation of specific deficiencies in her performance. (*Id.* at 17). Defendants also contend that, standing alone, the temporal proximity between plaintiff's FMLA leave and her termination is insufficient to support a finding of pretext, especially given the undisputed fact that Ms. Blankenship, Mr. Groetsch, and Mr. Hunziker discussed plaintiff's performance issues beginning in September 2014, two months before she requested her final FMLA leave in December 2014. (*Id.* at 19-20).

In response, plaintiff argues that there is a causal connection between her FMLA leave and termination on the basis of close temporal proximity, which is sufficient to establish a prima facie case of FMLA retaliation. (Doc. 45 at 11-12). Plaintiff argues that the following facts are evidence of pretext: (1) Ms. Blankenship first made the recommendation to terminate plaintiff after she began her leave in December 2014, (2) plaintiff's testimony and documented record establish that she had outstanding job performance in the years and months preceding her termination; (3) Ms. Blankenship's memorandum from December 2014 "is littered with false and misleading assertions about [plaintiff]'s alleged poor job performance." (*Id.* at 14-15). Plaintiff also maintains that she can establish pretext by showing that similarly situated employees were not fired or even disciplined for the same purported job failures. (*Id.* at 16). Plaintiff further argues that evidence of pretext is established on the basis that defendants allegedly destroyed one-page documents from her one-on-one meetings with Ms. Blankenship. (*Id.* at 17-18).

In reply, defendants argue that plaintiff's focus on the precise date of when Ms. Blankenship first recommended plaintiff's termination is immaterial because the "process began at least as early as September 2014." (Doc 48 at 9). Defendants explain that a September 29, 2014 email between Ms. Blankenship, Mr. Groetsch, and Mr. Hunziker, as well as the attached September 2014 Performance Document (in conjunction with plaintiff's past performance issues that resulted in probation and a warning that she could be terminated if her performance deteriorated again) "marked the start of an exhaustive process leading to plaintiff's termination." (*Id.* at 8). Defendants also contend that while plaintiff challenges the contents and accuracy of Ms. Blankenship's December 2014 memorandum, she does not challenge the performance deficiencies outlined in Ms. Blankenship's September 29, 2014 performance document. (*Id.* at 11). Further, defendants contend that plaintiff has failed to demonstrate pretext based on similarly situated employees and obtaining Medicare forms for the purposes of issuing settlement checks. (*Id.* at 12-13). Defendants state: "[t]here is not the slightest evidence plaintiff was terminated for this one specific act, and plaintiff never alleged this was so." (*Id.* at 13).

Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Upon returning from FMLA leave, an employee must be reinstated to her position or an equivalent position in terms of pay, benefits, and other conditions of employment. 29 U.S.C. § 2614(a)(1). The FMLA makes it unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise" FMLA rights. 29 U.S.C. § 2615(a)(1).

The "retaliation" or "discrimination" theory of liability under the FMLA arises under §

2615(a)(2), which prohibits an employer from discharging or discriminating against an employee

for "opposing any practice made unlawful by" the Act. *Bryson v. Regis Corp.*, 498 F.3d 561,

570 (6th Cir. 2007) (citing *Arban v. West Pub. Corp.*, 345 F.3d 400, 401 (6th Cir. 2003)). An

employer is prohibited from discriminating against an employee who has used FMLA leave and

cannot use the taking of FMLA leave as a negative factor in employment actions. *Arban*, 345

F.3d at 403 (citing 29 C.F.R. § 825.220(c)). This prohibition extends to retaliatory discharge of

an employee for taking FMLA leave. *Id.* (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272

F.3d 309, 314 (6th Cir. 2001)).

Absent direct evidence of unlawful conduct, FMLA retaliation claims are evaluated under

the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973). *Bryson*, 498 F.3d at 570. "[A] plaintiff may make out a prima facie case . . . by showing

that (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment

action, and (3) there was a causal connection between the adverse employment action and the

protected activity." *Id.* (citing *Skrjanc*, 272 F.3d at 314). "If the plaintiff satisfies her prima

facie showing, the burden shifts to the defendant to offer evidence of a legitimate,

non-discriminatory reason for the adverse employment action." *Id.* "If the defendant succeeds,

the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext

for unlawful discrimination." *Id.*

### a. *Plaintiff has established her prima facie case of FMLA retaliation*

In establishing a prima facie case, "the close temporal proximity between [FMLA] leave

and termination provides the necessary causal connection at this early stage of the analysis where

the burden of proof is minimal." *Roll v. Bowling Green Metalforming, LLC*, 457 F. App'x 458,

460 (6th Cir. 2012). *See also DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009) ("[T]his Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise."). However, "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Skrjanc*, 272 F.3d at 317 (citing *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1397-98 (10th Cir. 1997)).

The Court finds that plaintiff has established a prima facie case of FMLA retaliation. The parties dispute only whether plaintiff can show a causal connection between her use of FMLA leave and her termination. The undersigned concludes that the termination of plaintiff in January 2015—one month after she requested her final FMLA leave and while she was on the leave— "provides the necessary causal connection at this early stage of the analysis where the burden of proof is minimal." *Roll*, 457 F. App'x at 460. *See also DiCarlo*, 358 F.3d at 421; *Coffman v. Ford Motor Co.*, 719 F. Supp.2d 856, 863 (S.D. Ohio 2010) (Dlott, J) (citing *Singfield v. Akron Metro Housing Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (explaining that three-month lapse between the employee's protected act and the termination is sufficient to establish causation at summary judgment stage). *See also Woida v. Genesys Reg'l Med. Ctr.*, 4 F. Supp.3d 880, 899 (E.D. Mich. 2014) ("the Sixth Circuit has repeatedly held that, in the FMLA context, close proximity in time between the protected activity and the adverse employment action may constitute sufficient evidence of a causal connection."). Although defendants focus on the fact that plaintiff was granted multiple medical leaves without incident over the course of her employment, defendants have failed to show how previous grants of leave negate a causal

17

connection between plaintiff's termination and request for FMLA leave in establishing a prima facie case of retaliation.

### b. *Defendants have articulated a non-retaliatory reason for plaintiff's termination*

Defendants have articulated a legitimate, non-retaliatory reason for plaintiff's termination, which is that plaintiff was terminated for her "long-standing and persistent failure to meet her employer's reasonable performance expectations." (Doc. 37 at 15). *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116 (6th Cir. 2001) (increasingly poor job performance was a legitimate, nondiscriminatory reason for plaintiff's termination and thus the burden shifted back to plaintiff to show that a genuine issue of material fact existed as to whether defendant's reason was a pretext to mask discrimination). Therefore, the only issue remaining is whether a genuine dispute of fact exists that defendants' articulated reason is a pretext for discrimination.

### c. *Plaintiff has established an issue of fact as to whether defendants' proffered non-retaliatory reason for her termination was pretextual*

At the pretext stage, plaintiff has the burden to produce "sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired her." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). She can accomplish this by proving "'(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [her discharge], or (3) that they were *insufficient* to motivate discharge.'" *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012) (emphasis in original) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds*, *Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009)). The first type of showing consists of evidence that the reason offered for the plaintiff's discharge never happened, i.e., the

reason is factually false. *Manzer*, 29 F.3d at 1084. The third showing ordinarily consists of

evidence that other employees, particularly those outside the protected class, were not discharged

even though they engaged in conduct substantially identical to that which purportedly motivated

the plaintiff's discharge. *Id.* If the plaintiff establishes the first or third showing, a permissive

inference of discrimination arises. *Id.* For the second showing, the plaintiff must introduce

additional evidence of discrimination because the reasons offered by the defendant are not

directly challenged and therefore do not bring about an inference of discrimination. *Id.*

The Sixth Circuit has cautioned that *Manzer*'s three-part test is not to be applied in a

formalistic manner. *See Chen*, 580 F.3d at 400 n.4. Rather, the Court must bear in mind that

"[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or

not?" *Id.* The Court must ask whether the plaintiff has produced evidence that casts doubt on

the employer's explanation and, if so, how strong the evidence is. *Id.* The Sixth Circuit in *Chen*

explained:

> At the summary judgment stage, the issue is whether the plaintiff has produced
> evidence from which a jury could reasonably doubt the employer's explanation. If
> so, her prima facie case is sufficient to support an inference of discrimination at
> trial. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). But summary
> judgment is proper if, based on the evidence presented, a jury could not reasonably
> doubt the employer's explanation. *See Reeves v. Sanderson Plumbing Prod., Inc.*,
> 530 U.S. 133, 148 (2000) ("[A]n employer would be entitled to judgment as a
> matter of law if the record conclusively revealed some other, nondiscriminatory
> reason for the employer's decision, or if the plaintiff created only a weak issue of
> fact as to whether the employer's reason was untrue and there was abundant and
> uncontroverted independent evidence that no discrimination had occurred.").

*Id.*

In attempting to show pretext, plaintiff first argues that defendants' allegations of

declining poor performance have no basis in fact. Specifically, plaintiff argues that these

allegations are disputed by her own testimony and a documented record of outstanding job

performance in the years and months preceding her termination. (Doc. 45 at 14-15). Plaintiff also asserts that the record demonstrates that Ms. Blankenship first recommended that she be terminated after her FMLA leave began in December 2014, thus creating a temporal connection between her request for leave and termination. (*Id.*). Plaintiff further argues that defendants' allegations have no basis in fact because Ms. Blankenship's memorandum from December 2014 contains false statements about her job performance. (Doc. 45 at 15). As evidence, plaintiff cites performance evaluations from 2012 and 2013 and a 2014 "Lit Scorecard," as well as her testimony and declaration that she received positive feedback from Ms. Blankenship during their one-on-one meetings in 2014. (Doc. 44-1; Doc. 44-1; Pltf. Depo. Vol II. at 77; Pltf. Declaration at ¶ 4).

In this case, a reasonable juror could find that defendants' proffered reason for plaintiff's termination has no basis in fact. Plaintiff has presented sufficient evidence creating an issue of fact as to whether her performance actually motivated her discharge. In 2012 and 2013, plaintiff received positive performance evaluations from Ms. Blankenship. (Doc. 44-1 at 4-16). Ms. Blankenship stated that plaintiff had a "very good" year in 2013 and praised plaintiff's performance in coverage analysis, file quality, ability to resolve claims, and sound decision-making. (Doc. 44-1 at 4-11; Blankenship Depo. at 79-81, 85-87). In 2014, plaintiff's "Lit Scorecard" revealed that her overall production rate exceeded the company's goals (Blankenship Depo. at 102), and there is evidence that the "Lit Scorecard" reflected a Litigation Specialist II's job performance. (Gifford Depo. at 35). Plaintiff testified that she received positive feedback during her October 2014 one-on-one meeting with Ms. Blankenship. (Pltf. Depo. Vol. II at 77). Plaintiff stated that during this meeting, Ms. Blankenship did not communicate any performance deficiencies to plaintiff. (Pltf. Declaration at ¶ 5). She further stated that Ms. Blankenship never

advised her that her job performance was deteriorating and needed to improve. (*Id.*). Though Ms. Blankenship testified that the "Lit Scorecard" was not "significant" and she in fact communicated specific performance deficiencies to plaintiff, the evidence presented by plaintiff that contradicts Ms. Blankenship's testimony creates a genuine issue of fact for jury resolution. Viewing the evidence in the light most favorable to plaintiff, the evidence of positive performance, coupled with a lack of negative feedback communicated to plaintiff during monthly meetings, if believed, could allow a fact finder to conclude that plaintiff's performance did not actually motivate her termination. *See Cicero v. Borg-Warner Auto. Inc.*, 280 F.3d 579, 589 (6th Cir. 2002) (positive statements on plaintiff's job performance could allow jury to find that defendants' proffered reason had no basis in fact or that it was insufficient to motivate discharge decision), *overruled on other grounds*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 n. 4 (2009).

In addition, a reasonable juror could find that defendants' proffered reason has no basis in fact by reason of the suspicious timing of plaintiff's termination, coupled with plaintiff's evidence that Ms. Blankenship's December 29, 2014 memorandum contains false and misleading assertions. Unlike establishing a prima facie case of FMLA retaliation, "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Skrjanc*, 272 F.3d at 317. However, "suspicious timing is a strong indicator of pretext when accompanied by *some other, independent evidence*." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Bell v. Prefix, Inc.*, 321 F. App'x 423, 431 (6th Cir. 2009)) (emphasis added). Courts measure temporal proximity "from the time an employer learns of a protected activity to the time of the adverse employment action." *Hall v. Ohio Bell Tel. Co.*, 529 F. App'x 434, 440 (6th Cir. 2013)

(citing *Cecil v. Louisville Water Co.*, 301 F. App'x 490, 502 (6th Cir. 2008)). Defendants argue that plaintiff's pretext argument fails because she had a "long history of well-documented performance issues that resurfaced in 2014 before [she] requested her final December 2014 leave." (Doc. 48 at 11). Defendants point to the fact that plaintiff fails to challenge the accuracy of Ms. Blankenship's September 29, 2014 Performance Document. (*Id.* at 11-12). However, a genuine dispute of fact exists as to when Ms. Blankenship first recommended that plaintiff be terminated, which calls into question defendants' argument that plaintiff was terminated for a "long history of well-documented performance issues that resurfaced in 2014 before plaintiff requested her final December 2014 leave." Ms. Blankenship testified that she first recommended plaintiff's termination at a meeting with Mr. Groetsch and Mr. Hunziker in September 2014. (Blankenship Depo. at 44). However, Mr. Groetsch testified that he had not received a recommendation to terminate plaintiff prior to her leave in December 2014. (Groetsch Depo. at 31). Ms. Gillings testified that she could not recall whether Ms. Blankenship recommended plaintiff's termination around that time and instead suggested that Ms. Blankenship warn plaintiff about her performance issues. (Gillings Depo. at 21). Plaintiff denies awareness of any performance issues and recalls positive feedback from her one-on-one meetings with Ms. Blankenship. (Pltf. Declaration at ¶ 5). Thus, a jury could reasonably conclude that the September 2014 performance document and plaintiff's "long history of well-documented performance issues" were not sufficient in themselves to warrant plaintiff's termination in the third quarter of 2014.

Defendants point to additional evidence that they say justified plaintiff's termination— Ms. Blankenship's December 2014 memorandum asserting that plaintiff's performance had deteriorated to a level that she believed to be an immediate risk to the company. (Doc. 37-18).

Ms. Blankenship created this memorandum after gaining access to plaintiff's files contained in plaintiff's email account. (Blankenship Depo. at 172). She testified that this was the first time she ever requested access to a Litigation Specialist's email account. (*Id.*). Plaintiff has presented evidence creating a genuine issue of material fact that the reasons given by Ms. Blankenship in her December 2014 memorandum are misleading or false such that a jury could reasonably doubt defendants' explanation for plaintiff's termination.

For example, regarding the issuance of a settlement check in Claim No. 068235AA, Ms. Blankenship stated:

> [T]his case was settled for $50K. On November 17, 2014 [defense counsel] sent [plaintiff] an email/letter requesting the settlement check and advised that we only had 15 days to issue the check. She never issued the check. Counsel reached out to another [litigation] specialist on Dec. 10th and asked him to issue it and he did. Plaintiff counsel is threatening to amend his complaint to add a bad faith count against the company for not supplying the settlement check within the agreed upon timeframe.

(Doc. 37-18 at 2). As to this incident, plaintiff has produced evidence that defense counsel sent her a letter on November 17, 2014 advising her to issue the settlement check within *thirty* days, not fifteen days. (Doc. 44-5 at 9). Therefore, any issues with the settlement check arose after plaintiff began her FMLA leave on December 2, 2014. Similarly, in a second incident involving a settlement check, Ms. Blankenship alleged the following in her memorandum for Claim No. 068195AA:

> [T]his was a case that was settled for $120K. Our attorney sent check issuance instructions to [plaintiff] on Nov 19th. She never issued the check. I received a call from the attorney telling me that the check had to arrive by tomorrow or interest would accrue on the settlement. I had to overnight manual checks to avoid this.

(Doc. 37-18 at 3). As to this incident, plaintiff has offered evidence that American Modern requires receipt of a W-9 tax form from the plaintiff's law firm before issuing a settlement check. (Blankenship Depo. at 220). However, Ms. Blankenship did not receive the W-9 tax form from

counsel until December 12, 2014—over one week after plaintiff's leave began. (Doc. 44-6 at 13; Blankenship Depo. at 221). Thus, any issues with the settlement check arose after plaintiff began her FMLA leave on December 2, 2014.

In a third incident involving a settlement check for Claim No. 2614807, Ms. Blankenship alleged the following:

> [A]gain the settlement check was not issued. . . . [Plaintiff] was on vacation this day, however, prior emails had been sent by counsel giving her all the information needed to issue the check. When confronted with this, [plaintiff] says "we'll [sic], I was waiting on the Medicare Form"—to me this is an unacceptable response and further evidence that she does not adhere to our guidelines, which require we secure a Medicare form at the initial stages of the claim. Waiting until the last minute or at settlement is unacceptable.

(Doc. 37-18 at 3). Plaintiff has produced evidence that her decision to wait for the Medicare form did not violate company guidelines. Rather, it was common practice for litigation specialists to obtain the Medicare release forms after the case settled and not early in the litigation. (Wedemeyer Depo. at 22-23; Groetsch Depo at 73-74; Gifford Depo at 47-48; McElroy Depo at 11-12). Moreover, Ms. Blankenship never disciplined other litigation specialists for waiting to receive a Medicare form prior to issuing a settlement check. (Blankenship Depo. at 228).

In another incident (Claim #2508451), Ms. Blankenship criticized plaintiff for not issuing a settlement check despite having "all [the] necessary documentation" to issue the check. (Doc. 44-4 at 20). Plaintiff has produced evidence that calls into question the factual basis for Ms. Blankenship's criticism. Plaintiff's evidence shows that on December 11, 2014, while plaintiff was on leave, Ms. Blankenship discovered a W-9 form had not yet been submitted by defense counsel and requested this information. Thus, despite Ms. Blankenship's representation to the contrary, plaintiff did not have "all [the] necessary documentation" to issue a settlement check

before her leave began on December 2, 2014. (Doc. 44-4 at 20; Doc. 45, Simon Decl., ¶ 3, #D-2738-39).

Plaintiff has likewise produced evidence raising factual issues about the remaining incidents cited by Ms. Blankenship as the most serious performance issues justifying plaintiff's termination, including information omitted from Ms. Blankenship's memorandum suggesting that plaintiff may have taken appropriate action under the circumstances. (Doc. 45-1 at 12-20, and citations contained therein). The jury could conclude from plaintiff's evidence that Ms. Blankenship's memorandum on plaintiff's performance "deficiencies" was misleading and incomplete, such that the jury could reasonably doubt defendants' stated reasons for terminating plaintiff.

Plaintiff has adduced evidence raising genuine issues of fact that defendants' stated reasons for her termination were pretextual.[3]

>    d. *Defendants are not entitled to an honest belief defense*

Defendants argue that their decision to terminate plaintiff was based on well-documented evidence establishing her long history of performance issues and they are therefore entitled to the honest belief defense adopted in the Sixth Circuit. (Doc. 37 at 17). Defendants argue:

> Plaintiff was placed on two performance review plans and a formal probation, and was summoned to numerous meetings to address her performance issues. In connection with these meetings and probationary/review periods, management painstakingly documented specific deficiencies in plaintiff's performance, and held numerous meetings among Litigation Department supervisors, Human Resources and the Legal Department before deciding to terminate plaintiff for failing to correct her deficiencies.

---

[3] Because plaintiff has established pretext by demonstrating that defendants' proffered reason for her termination has no basis in fact, the Court finds it unnecessary to consider plaintiff's other pretext arguments—namely, that pretext exists because similarly situated employees were not fired or disciplined for the same purported job failures and that pretext exists through adverse inference. (Doc. 45 at 16-17).

(*Id.*). Defendants also argue that their honest belief is corroborated by plaintiff's former colleagues, who provided sworn statements confirming plaintiff's serious performance issues. (*Id.*).

Plaintiff responds that defendants cannot prevail on the honest belief defense. (Doc. 45 at 19). Plaintiff argues that "management's failure to even give [her] the *opportunity* to respond to the newly discovered performance errors is alone sufficient to reject the 'honest belief' defense." (*Id.*). Plaintiff further argues defendants cannot prevail on an honest belief defense because the reasons stated for her termination are "plainly dishonest." (*Id.* at 19-20).

Where the plaintiff disputes that there was no basis in fact for her discharge, she cannot establish pretext simply because the reason for her discharge was ultimately shown to be incorrect "as long as an employer has an honest belief in its proffered non-discriminatory reason[.]" *Tillman v. Ohio Bell Telephone Co.*, 545 F. App'x 340, 349 (6th Cir. 2013) (quoting *Majewski*, 274 F.3d at 1117; *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998) ("so long as the employer honestly believed in the proffered reason given for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless.")). When the defendant invokes the "honest belief" rule, "the plaintiff must allege more than a dispute over the facts upon which [her] discharge was based. [S]he must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Id.* (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001) (citing *Smith*, 155 F.3d at 806-07). To determine whether the defendant had an "honest belief" in the proffered basis for the employee's discharge, the Court examines whether the defendant has established "'reasonable reliance' on the particularized facts that were before it at the time the decision was

made." *Id.* (quoting *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 502-03 (6th Cir. 2007); *Braithwaite*, 258 F.3d at 494). In making this determination, it is not necessary that the employer's decisional process "be optimal" or that the employer "left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (quoting *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Smith*, 155 F.3d at 807). *See also Wright v. Univ. of Cincinnati*, 58 F. Supp.3d 854, 861-62 (S.D. Ohio 2014).

In this case, plaintiff has produced sufficient evidence creating a genuine issue of material fact as to whether defendants made a reasonably informed and considered decision for her termination. For example, Ms. Blankenship testified that it is fair to get an employee's input when an employee is placed on a performance plan or probation. (Blankenship Depo. at 140). She also testified that it is fair to get an employee's side of the story when criticizing an employee for a particular job performance issue. (*Id.* at 141). However, Ms. Blankenship never gave plaintiff the opportunity to respond to alleged performance issues before she was fired. (*Id.*). Ms. Blankenship explained that the performance issues were "black and white." (*Id.*). But plaintiff has adduced evidence that Ms. Blankenship ignored evidence that favored plaintiff, which demonstrates that her performance issues were not "black and white." *See Wright*, 58 F. Supp.3d at 861-62 (citing cases within the Sixth Circuit rejecting an honest belief defense based on an employer's scant or flawed investigation into plaintiff's misconduct). Specifically, plaintiff's 2014 "Lit Scorecard" indicated that her overall production rate exceeded the company goals. (Doc. 44-2). Plaintiff recalls mostly positive feedback from monthly meetings in 2014 and was unaware of any performance deficiencies. (Pltf. Declaration at ¶¶ 4-5). Moreover, as explained above, plaintiff has produced evidence showing that the contents of Ms. Blankenship's

December 2014 memorandum were not entirely accurate or were misleading, despite Ms. Blankenship's knowledge to the contrary.

Although an "optimal" investigation—i.e., interviewing the employee and some or all of his witnesses—is "not a prerequisite to application of the honest belief rule," *see Seeger*, 681 F.3d at 285-87, the defendants in this case terminated plaintiff without seeking information or investigating facts beyond those represented by Ms. Blankenship. "Where a decision-maker's 'own testimony shows that he did not ascertain or know all the relevant facts, and he did not think it important to know such facts before terminating' a plaintiff's employment, 'the honest-belief defense does not apply.'" *Pelham v. Unipres U.S.A., Inc.*, 129 F. Supp.3d 582, 588 (M.D. Tenn. 2015) (quoting *Moffat v. Wal-Mart Stores, Inc.*, 624 F. App'x 341, 349 (6th Cir. 2015)). Here, the record reflects that Ms. Blankenship found it unnecessary to hear plaintiff's side of the story before her termination or conduct thorough factual findings as to plaintiff's performance deficiencies. In *Seeger*, the Sixth Circuit recognized that the defendants had conducted a "thorough" investigation, which included employer-conducted interviews, formal statements, requesting documentation from an employee, and giving the employee the opportunity to submit additional relevant information. *Seeger*, 681 F.3d at 287. Here, however, the record contains sufficient evidence that defendants' decision to terminate was not reasonably informed, which precludes the application of the honest-belief defense. Accordingly, summary judgment on plaintiff's FMLA claim should be denied.

### B. Disability Discrimination under the ADA and the Ohio Civil Rights Act, Ohio Rev. Code § 4112.02

Defendants argue that plaintiff cannot establish a prima facie case of discrimination under the ADA. (Doc. 37 at 10-11). Defendants contend that plaintiff cannot establish that she was "disabled" under the ADA at the time of her termination in January 2015 because she offers no

evidence that her diabetes, depression, or carpel tunnel syndrome substantially limited a major life activity prior to her termination, or that defendants regarded her as having such limitations. (*Id.* at 11-12). Defendants further contend that plaintiff admitted that despite her medical conditions, she was "fully capable of performing effectively all of the essential job duties of a Litigation Specialist II[.]" (*Id.* at 12) (citing Pltf. Depo. Vol I. at 209).

Plaintiff responds that she can establish a prima facie case of disability discrimination. (Doc. 45 at 20). Specifically, plaintiff asserts that she suffers from Type II diabetes, took medication for the condition, and defendants were aware of the condition. (*Id.*). Plaintiff argues that the pretext evidence supporting her FMLA retaliation claim likewise supports her disability discrimination claim. (*Id.* at 21).

In disability discrimination cases, Ohio courts look to federal regulations and cases interpreting the ADA for guidance in interpreting Ohio law. *See, e.g.*, *Knapp v. City of Columbus*, 192 F. App'x 323, 328 (6th Cir. 2006); *Spencer v. Nat'l City Bank*, 732 F. Supp.2d 778, 787 (S.D. Ohio 2010); *City of Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206-07 (Ohio 1998). The ADA, 42 U.S.C. § 12101 *et seq.* prohibits an employer from discharging any individual on the basis of disability. Because the alleged discriminatory acts in this case occurred after January 1, 2009, the ADAAA applies. *Milholland v. Sumner Cty. Bd. of Educ.*, 569 F.3d 562, 566-67 (6th Cir. 2009). In order to establish a claim for disability discrimination, a plaintiff must first establish that she is "disabled" within the meaning of the Act. *McKay v. Toyota Motor Mfg., U.S.A., Inc.*, 110 F.3d 369, 371 (6th Cir. 1997).

Under the ADAAA, "disability" means: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment. . . ." 42 U.S.C. § 12102(1).

"Major life activities" include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12101(2)(A). An impairment is a disability if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii).

In the absence of direct evidence of discrimination on the basis of disability, a plaintiff may prove discrimination using the burden-shifting analysis set forth in *McDonnell Douglas*. *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998). If the plaintiff states a prima facie case of disability discrimination, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse action. *Id.* Once the defendant proffers such a reason, the burden shifts back to the plaintiff to show that it is a pretext for discrimination. *Id.*

To make a prima facie case of disability discrimination, a plaintiff must show that (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the position, with or without reasonable accommodation; (3) she suffered an adverse employment action because of her disability; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011).

In this case, plaintiff has failed to establish that her diabetes qualifies as a disability under the Act. "Merely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002). Moreover, diabetic status *per se* is insufficient to qualify as a disability under the ADA. *Greer v. Cleveland Clinic Health Sys. E. Region*, No. 1:10-cv-1624, 2011 WL 590223, at *5 (N.D. Ohio Feb. 10, 2011), *aff'd sub nom. Greer v. Cleveland Clinic Health Sys.-E. Region*, 503 F. App'x 422 (6th Cir. 2012)

(internal citations omitted). Here, plaintiff asserts her diabetes as the sole basis for establishing disability. However, she has failed to put forth evidence establishing that her diabetes substantially limits one or more of her major life activities. Nor has she developed an argument or put forth evidence that defendants regarded her as having such an impairment. Further, plaintiff testified that she was "fully capable of performing effectively all of the essential job functions of a litigation specialist II." (Pltf. Depo. Vol. I at 209). Accordingly, plaintiff has failed to establish a prima facie case of disability discrimination, and summary judgment should be granted in favor of defendants on plaintiff's ADA and Ohio Rev Code § 4112.02 disability discrimination claims.

### C. Gender discrimination under Ohio Rev. Code § 4112.02

Defendants argue that summary judgment should be granted in their favor on plaintiff's state law gender discrimination claim because she fails to establish a prima facie case. (Doc. 37 at 9). Defendants state: "plaintiff cannot produce a shred of credible evidence supporting her claim." (*Id.* at 10).

Plaintiff responds that she can establish a prima facie case of gender discrimination because it is undisputed that she was replaced by a male employee. (Doc. 45 at 21) (citing Defendants' Statement of Facts, Doc. 37-1 at ¶ 68).

The Ohio Civil Rights Act provides that it shall be an unlawful discriminatory practice "[f]or any employer, because of the . . . [sex] . . . of any person . . . to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Rev. Code § 4112.02(A). Plaintiff's state law gender discrimination claim is analyzed under the same *McDonnell Douglas* burden shifting analysis as her FMLA retaliation claim. *Gettings v. Bldg. Laborers Local 310 Fringe Benefits*

*Fund*, 349 F.3d 300, 305 (6th Cir. 2003). The prima facie case requirements for state law gender

discrimination claims under § 4112.02(A) are the same as federal law gender discrimination

claims under Title VII of the Civil Rights Act of 1964. *Id.* Thus, to establish a prima facie case

of gender discrimination under Ohio Rev. Code § 4112.02(A), a plaintiff must show: (1) she was

a member of a protected class; (2) she suffered an adverse employment action; (3) she was

qualified for the position; and (4) she was replaced by a person outside the protected class, or she

was treated differently from similarly situated members of the unprotected class. *Peltier v.*

*United States*, 388 F.3d 984, 987 (6th Cir. 2004).

Here, plaintiff has established a prima facie case of gender discrimination under Ohio

Rev. Code § 4112.02(A). The parties mainly dispute whether plaintiff has established the fourth

element of a prima facie case. (*See* Doc. 45 at 21, Doc. 48 at 16). However, the Sixth Circuit

"has consistently held that a showing that a plaintiff's replacement was not a member of the

plaintiff's protected class was sufficient to satisfy the fourth element." *Vincent v. Brewer Co.*,

514 F.3d 489, 496 (6th Cir. 2007). Here, plaintiff has established, and defendants do not dispute,

that plaintiff was replaced by a male. (Doc. 37-1 at ¶ 68). Thus, the Court finds that plaintiff has

established her prima facie case.

As described above, defendants have articulated a legitimate, non-discriminatory reason

for plaintiff's termination—that plaintiff exhibited a long-standing and persistent failure to meet

reasonable performance expectations. (Doc. 37 at 15). As described in connection with

plaintiff's FMLA claim, plaintiff has presented sufficient evidence raising a genuine issue of fact

as to whether defendants' reason was a pretext for discrimination. The same analysis applies

here with plaintiff's state law gender discrimination claim. Therefore, defendants' motion for

summary judgment on plaintiff's Ohio Rev. Code § 4112.02 gender discrimination claim should be denied

**V. Conclusion**

Based on the foregoing, it is **RECOMMENDED** that:

1. Defendants' motion for summary judgment (Doc. 37) be **DENIED** as to plaintiff's FMLA retaliation and Ohio Rev. Code § 4112.02 gender discrimination claims.

2. Defendants' motion for summary judgment (Doc. 37) be **GRANTED** as to plaintiff's ADA and Ohio Rev. Code § 4112.02 disability discrimination claims.

Date: _7/24/18_

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

DEANNA SMITH,
    Plaintiff,

    vs.

AMERICAN MODERN INSURANCE GROUP, et al.,
    Defendants.

Case No: 1:16-cv-844

Dlott, J.

Litkovitz, M.J.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).